# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **MERITA WILLIAMS** | **CIVIL ACTION** |
| **VERSUS** | **NO:  07-3958-LMA-SS** |

**MICHAEL J. ASTRUE, COMMISSIONER
OF SOCIAL SECURITY ADMINISTRATION**

## REPORT AND RECOMMENDATION

The plaintiff, Merita S. Williams ("Williams"), seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claims for disability insurance benefits and a period of disability under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423, and her claim for supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382(a)(3).

## PROCEDURAL HISTORY

On June 7, 2001, Williams filed applications for benefits.  R. 15 and 26.  On November 30, 2001, they were denied.  R. 15.  On January 15, 2003, an Administrative Law Judge ("ALJ") issued an unfavorable decision.  R. 15 and 23-32.  On July 7, 2003, Williams filed further applications for benefits.  R. 64.  On September 11, 2003, they were denied.  R. 33.  On March 8, 2006, there was a hearing before an ALJ.  R. 298.  On June 29, 2006, the ALJ issued an unfavorable decision.  R. 13.  On July 10, 2007, the Appeals Council denied Williams' request for review.  R. 6.

On August 3, 2007, Williams filed a complaint for review with this Court.  Rec. doc. 1.  The parties submitted cross-motions for summary judgment.  Rec. docs. 14 and 16.  Williams is represented by counsel in this Court.

## STATEMENT OF ISSUES ON APPEAL

1. Did the ALJ err in rejecting the opinions of Williams' treating physicians?

2. Did the ALJ err by not contacting the treating physicians to obtain additional information?

3. Did the ALJ err in rejecting the opinions of the treating physicians without addressing the factors in 20 C.F.R. 404.1527(d)(2)?

## THE COMMISSIONER'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following findings relevant to the issues on appeal:

1. Williams met the insured status requirements of the Social Security Act through September 30, 2004.

2. Williams has not engaged in substantial gainful activity at any time relevant to this decision (20 C.F.R. 404.1520(b), 404.1571, *et seq*., 416.920(b) and 416.971 *et seq*.)

3. Williams has the following severe impairments: degenerative disc disease of the cervical and lumbar spine, carpal tunnel syndrome, and degenerative joint disease of the left shoulder (20 C.F.R. 404.1520(c) and 416.920(c)).

4. Williams does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. Williams has the residual functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk six hours of an eight-hour workday; and sit six hours of an eight-hour workday. In other words, claimant can perform a full range of "light" work.

6. Williams is capable of performing her past relevant work as cashier, security guard, and housekeeper/cleaner. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. 404.1565 and 416.965).

7. Williams has not been under a "disability," as defined in the Social Security Act, from January 16, 2003 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

R. 17-21.

## ANALYSIS

a.     **Standard of Review.**

    The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000); Spellman v. Shalala, 1 F.3d 357, 360 (5th Cir. 1993). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); Newton, 209 F.3d at 452. Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000). This court may not re-weigh the evidence, try the issues *de novo* or substitute its judgment for the Commissioner's. Id.; Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

    The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992). Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. Villa, 895 F.2d at 1022; Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

    To be considered disabled and eligible for disability insurance benefits, plaintiff must show that she is unable "to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).   The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.   20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (1997).   The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.   Id. §§ 404.1520, 416.920; Newton v. Apfel, 209 F.3d at 453; Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 514 U.S. 1120, 115 S. Ct. 1984 (1995).[1]   The five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled.   Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995).

The claimant has the burden of proof under the first four parts of the inquiry.   Id.   If she successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy, which the claimant is capable of

---

[1]   The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.   Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.   Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.   If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.   Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.   If the claimant cannot meet the demands, he or she will be found disabled.   Id. §§ 404.1520(f)(1), 416.920(f)(1).   To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.   When the findings made with respect to claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.   Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (1994) ("Medical-Vocational Guidelines").

performing.  Greenspan, 38 F.3d at 236; Kraemer v. Sullivan, 885 F.2d 206, 208 (5th Cir. 1989).

When the Commissioner shows that the claimant is capable of engaging in alternative employment,

"the ultimate burden of persuasion shifts back to the claimant."  Id.; accord Selders, 914 F.2d at 618.

The Court "weigh[s] four elements of proof when determining whether there is substantial

evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and

examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) [her] age,

education, and work history."  Martinez v. Chater, 64 F.3d 172, 174 (5th Cir. 1995).  "The

Commissioner, rather than the courts, must resolve conflicts in the evidence."  Id.

b.    **Testimony at the March 8, 2006 Hearing.**

Williams' attorney reported that the onset of disability was January 16, 2003 because the

ALJ denied the first applications for benefits on January 15, 2003.  R. 302.

Williams was born in 1953.  R. 301.  She completed three years of college.  R. 301.  Her

prior work included security guard, cook, substitute school teacher, substitute school cook, and

construction.  R. 302.  She had not worked sometime since before June 7, 2001.  R. 15 and 302.

Williams lived in an apartment with her two sons and a friend.  R. 302.  She did some chores

like cleaning, but it took her a while to do them.  R. 303.  She had a driver's license, but did not

drive because of problems with her neck.  R. 303.  She needed some help bathing and taking care

of herself.  R. 303.  She only left the apartment about once a week to go to the grocery store.  R. 304.

She could push the basket, but needed help picking up the groceries.  R. 304.  She got up at about

4:00 a.m.  R. 303.  During the day, she did the laundry, watched television and listened to music.

R. 303.  She sat and slept during the day.  R. 303.

Williams' major complaint was the lower part of her back.  R. 304.  She had spasms down

her legs and was in constant pain.  R. 304.  Standing for long periods made the pain worse.  R. 304.

She could not stand for more than twenty minutes without having pain.  R. 304.  She could not walk

as far as a block without experiencing pain.  R. 305.  She could not bend or crawl.  R. 305.  To

retrieve something from a lower cabinet, she had to stoop and hold onto something.  R. 305.  She

could not sit for more than thirty minutes without having problems.  R. 305.

Williams experienced pain in her upper shoulder blades.  R. 305.  She was able to reach her

hands over head.  R. 305.  She could push to open a door but she could not pull to open a door.  R.

305.  She had carpal tunnel syndrome, so her fingers locked at times.  R. 305.  She could write but

sometimes her fingers cramped.  R. 306.  She could pick up a toothpick but not a pin.  R. 306.  She

could pick up a gallon of milk without a problem.  R. 306.  She took prescription medication for

pain, inflammation in her joints, blood pressure, and asthma.  R. 306-07.  She had an asthma attack

about every six months.  R. 306-07.  She used an aerosol spray as necessary.  R. 307.

The vocational expert testified that Williams' prior employment included cashier, cook,

security guard, and housekeeper/cleaner.  The expert described the exertional requirements for these

positions.  R. 307-08.  Based upon the ALJ's hypothetical question, the expert testified that Williams

could perform all of her past relevant work except for the position of cook.  R. 308.  If all of

Williams' testimony concerning her limitations was fully credited, she was unable to perform any

of her past relevant work and there was no work she could perform.  R. 308.

c.      **Medical Evidence**.

2000

On April 27, 2000, Williams was seen by Dr. Roland Waguespack.[2]  R. 180.  On May 30,

---

[2]  The record does not reveal a speciality for Dr. Waguespack.

2000, she called Dr. Waguespack and requested an antibiotic and medication for nausea.  R. 180.
On June 28, 2000, she was seen by Dr. Waguespack and complained of sinus problems and tension.
R. 179.  On August 5, 2000, she called Dr. Waguespack and requested medication.  R. 178.  On
October 14, 2000, she was seen by Dr. Waguespack and complained of sinus problems.  R. 177.  On
October 30 and November 4, 2000, she called Dr. Waguespack and requested refills of her
medication.  R. 176.  On November 15, 2000, an x-ray indicated that there might be a cyst on her
right ovary.  R. 132.  On November 24, 2000, she was seen by Dr. Waguespack and complained of
cold and dizziness.  R. 176.  On November 16, 2000, an x-ray of the lumbar spine revealed
degenerative changes.  No spondylolysis was identified.  R. 131.

<u>2001</u>

On January 1, 2001, Williams was seen by Dr. Waguespack and complained of a cold and
chest discomfort.  R. 174.

On February 12, 2001, Williams complained of allergies to M. Dirk Ory, M.D., who
practiced family and occupational medicine.  R. 121.  An ECG was within normal limits.  R. 130.

On February 26, 2001, Williams was seen by Dr. Waguespack and complained of sinus
problems, a head cold and a chest cold.  R. 174.  On March 13, 2001, she was seen by Dr.
Waguespack with complaints of fatigue and high blood pressure.  R. 173.  On April 29, 2001, she
returned to Dr. Waguespack with sinus problems and a cough.  R. 172.  On June 16, 2001, she called
Dr. Waguespack for medication.  R. 171.

On June 20, 2001, Williams complained to Dr. Ory of pain in her left side that ran across her
stomach.  Medication was prescribed.  R. 119.  He referred her to Leonard J. Chabert Medical
Center ("Chabert Hospital") for an evaluation of the pain in her chest and abdomen.  R. 120.  On that

7

day she visited the St. James Parish Hospital emergency room with complaints of pain in her abdomen. R. 276-281. An ECG was within normal limits. R. 126. X-rays of the abdomen revealed mild, nonspecific prominence of the bowel gas pattern and calcifications projecting over the pelvis. R. 129.

On August 7, 2001, Williams was seen by Dr. Waguespack with complaints of acute pain from a spider bite. R. 171. On August 18, 2001, she called Dr. Waguespack for medication refills. R. 170.

On November 10 and 14, 2001, Williams complained to Dr. Ory of back pain. A question was raised about an ovarian cyst. R. 122-23.

On November 18, 2001, Williams complained of a cough, congestion, upper back spasms and pain to Raja Talluri, M.D., a specialist in internal medicine. R. 162. On November 29, 2001, she was seen by Dr. Talluri for numbness in her hand. R. 160. On December 27, 2001, she returned to Dr. Talluri with complaints of low back pain and high blood pressure. R. 161.

<u>2002</u>

On January 15, 2002, Williams was seen by Dr. Talluri for coughing and congestion. R. 159. On January 22, 2002, Dr. Talluri completed a physical capacity evaluation for Williams. R. 226-27. On February 12, 2002, she returned to Dr. Talluri for coughing and pain in the abdomen. R. 158. On March 19, 2002, she was seen by Dr. Talluri for a cough, sore throat, low grade fever and back pain. R. 157. On April 9, 2002, she returned to Dr. Talluri with pain in her left shoulder. R. 156. On June 10, 2002, she was seen by Dr. Talluri for pain in her abdomen and low back. R. 154.

On June 26, 2002, cervical x-rays revealed good alignment and maintained height. Small marginal spurs were present at C4-5 and C5-6. Small spurs were projecting into the left neural

foramen at C6-7.  R. 165.  On July 24, 2002, Williams was seen by Dr. Talluri for pain in her low back.  R. 153.  On September 17, 2002, she was seen by Dr. Talluri for pain in her left ear.  R. 152. On October 22, 2002, Williams returned to Dr. Talluri for a follow-up.  No new problems were reported.  R. 150.  On November 19, 2002, Williams was seen by Dr. Talluri for coughing.  The diagnosis was bronchitis.  R. 149. On December 19, 2002, Williams was seen by Dr. Talluri for high blood pressure.  R. 148.

<u>2003</u>

On January 8, 2003, Williams was seen by Dr. Talluri for swelling of the stomach.  R. 147. On January 22, 2003, Dr. Talluri reported that she needed to remain at home.  R. 164.  On January 23, 2003, she returned to Dr. Talluri with complaints of dizziness and fainting.  R. 146.  On January 30, 2003, she reported stomach pain.  R. 145.  On February 17, 2003, she visited the St. James Parish Hospital emergency room with complaints of chronic cough.  R. 272-75.  On February 28, 2003, she returned to the emergency room with complaints of pain in her back and abdomen.  R. 267-271.  On March 10, 2003, she went to Dr. Talluri for pain in the left leg and ankle.  R. 144.

On May 19, 2003, Williams was seen by Dr. Talluri for complaints of pain in the left shoulder.  R. 142.  On June 6, 2003, she was seen by Dr. Talluri for high blood pressure.  R. 143. On June 23, 2003, x-rays of the left shoulder indicated degenerative changes.  There was no evidence of an acute fracture or dislocation.  R. 124 and 167.  On July 2 and 9, 2003, she was seen by Dr. Talluri for complaints of pain in the left shoulder. R. 140-41.  On July 18, 2003, she returned to Dr. Talluri with complaints of feeling light headed and nauseated.  R. 240.

On July 17, 2003, x-rays of the lumbar spine revealed that the vertebral bodies were in good alignment and were maintained in height.  R. 133.  There appeared to be mild diffuse narrowing of

the lumbar discs.  There were small marginal spurs about the cervical discs with posterior spurring at C4-5 and C5-6.  Small spurs were seen projecting into the left neural foramen at C6-7. Degenerative changes were present with small marginal spurs.  No spondylolysis was identified. R. 125 and 133.  X-rays of the pelvis indicated a probable cyst in the right ovary.  R. 134.

On July 21, 2003, Dr. Talluri completed a two-page form for Williams' indicating that she could not perform light duty work.  For example, he indicated that she could not stand or walk six hours in an eight-hour day.  R. 230-31.

On July 29, 2003, Williams returned to Dr. Talluri with complaints of low grade fever.  R. 139.  On August 22, 2003, she was seen by Dr. Talluri for complaints of coughing, constipation and low grade fever.  R. 239.  On September 30, 2003, she was seen by Dr. Talluri for a swollen left eye and insomnia.  R. 238.

On September 4, 2003, Williams was examined by Dr. N. Reddy, M.D.[3]  Dr. Reddy reported that she was on the following medication: Albuterol inhaler; Celebrex; Oxybumetone for pain; Monopril; Xanax; Dilantin; and Premarin.  The neurological part of the exam found that her cranial nerves, motor, sensory, speech, gait and reflexes were normal.  She was able to walk on heels and toes.  She could bend and extend the back.  There were no sensory or motor deficits.  The range of motion of the back and neck and all extremities were normal.  There was no muscle atrophy.  R. 181-83.

On September 9, 2003, Williams was seen by Warren Williams, M.D., a neurosurgeon, for a disability evaluation.  R. 250.  On October 8, 2003, Dr. Williams reported that she had the signs of advance lumbar degenerative disc disease.  He opined that she was permanently and totally

---

[3]  The record does not reveal a speciality for Dr. Reddy.

disabled from any type of gainful employment.  R. 249.

On October 20, 2003, Williams was seen by Anthony Ioppolo, M.D., a neurological surgeon, on a referral from Dr. Talluri.  Her main complaints were carpal tunnel syndrome.  Dr. Ioppolo suspected a musculoskeletal problem relating to the neck and shoulder.  R. 246-47.  On October 23, 2003, she was seen for a physical therapy evaluation of her neck.  R. 266 and 282.  On November 10, 2003, Williams was seen by Dr. Ioppolo.  She complained of pain in the right heel when she walked, which Dr. Ioppolo attributed to a heel spur.  R. 245.

On December 14, 2003, Williams went to an emergency room with complaints of a flair up of back pain.  She requested a cortisone shot.  The diagnosis was muscle pain.  She also reported chronic bronchitis.  She was discharged on the same day with her condition described as good.  R. 260-64.

On December 16, 2003, Williams was examined by Dr. Ioppolo, who reported that Williams was using carpal tunnel splints.  She was sleeping better at night, but still had numbness.  R. 244.

On December 26, 2003, Williams was seen by Dr. Talluri for complaints of coughing and constipation.  R. 236.

<u>2004</u>

On January 12, 2004, Williams was examined by Dr. Ioppolo, who reported that, after using some carpal tunnel splints and physical therapy, her neck was better.  The remaining problem was her back.  He ordered an MRI of her lumbar spine.  R. 243.  It revealed a disc bulge at L5-S1 and disc protrusion consistent with moderate spinal stenosis.  At S1-2 there was a disc bulge and protrusion consistent with minimal spinal stenosis.  R. 241-42.  On February 24, 2004, Dr. Ioppolo completed a two-page form for Williams' symptoms, which indicated that she could not perform

11

light duty work.  For example, he indicated she could not stand or walk six hours in an eight-hour day.  R. 228-29.

On March 9, 2004, the physical therapist reported that low back exercises were initiated.  R. 286.  On March 23, 2004, the therapist reported that the neck had progressed well and more work was required on the low back.  R. 287.  On April 20, 2004, the therapist reported that Williams was back from a long trip.  She felt all right.  She rated her back pain as a four on a scale of one to ten. R. 288.  On April 22, 2004, Williams was discharged from physical therapy after the goals were met. R. 289.

On April 30, 2004, Williams visited the St. James Hospital emergency room and reported headaches, nausea and low back pain. R. 255-59.  On May 10, 2004, she returned to the emergency room with complaints of constant headaches.  R. 252-54.

On May 20, 2004, Dr. Williams completed a two-page form in which "yes" was checked for all symptoms or signs, for example there was evidence of nerve root compression as demonstrated by reflex loss.  His answers also indicated that Williams was not capable of light duty work.  R. 185-86.

On July 29, 2004, Williams was seen at Chabert Hospital for bronchitis.  She was told to stop smoking.  R. 222-25.

<u>2005</u>

On March 14, 2005, Williams was seen at Chabert Hospital for a follow-up for results of tests.  R. 219-21.  On July 18, 2005, Williams was seen at Chabert Hospital for an annual exam.  R. 217-18.  On July 24, 2005, Williams was seen at Chabert Hospital  emergency room for a laceration to the right eye.  R. 211-14.  On October 11, 2005, Williams was seen at Chabert Hospital for

constipation.  R. 207-09.  On October 12, 2005, there was a mammogram.  A finding in the right breast was probably benign.  A follow-up was scheduled in six months.  R. 210.  On October 19, 2005, Williams was seen by Dr. Talluri for constipation and pain in the abdomen.  R. 190.  On November 2, 2005, Williams was seen at Chabert Hospital for constipation.  R. 205.  On November 18, 2005, Williams was seen by Dr. Talluri for a shoulder problem and muscle spasms.  R. 189.  On December 21, 2005, there was a normal colonoscopy.  R. 203-04.

<u>2006</u>

On January 6, 2006, Williams was seen by Dr. Talluri for a cough. R. 188.  On January 7, 2006, she was seen at Chabert Hospital for complaint of a cough.  R. 198.  On January 16, 2006, she was seen at Chabert Hospital for incontinence.  R. 201-02.

On March 20, 2006, x-rays of the maxillofacial region revealed a blowout fracture of the floor of the right orbit with herniation of orbital fat into the right maxillary sinus.  The diagnosis was injury to face or face trauma to the right eye.  R. 192-96.

d.      **Plaintiff's Appeal.**

<u>Issue no. 1</u>.      Did the ALJ err in rejecting the opinions of Williams' treating physicians?

Williams urges that three of her treating physicians determined that she could not perform light duty work.  She refers to two page residual functional capacity forms completed and signed by: (1) Dr. Williams on May 20, 2004 (R. 185-86); (2) Dr. Talluri on July 21, 2003 (R. 230-31); and (3) Dr. Ioppolo on February 24, 2004 (R. 228-29).  Williams contends that the ALJ improperly rejected these reports and related medical records and determined that Williams could perform a full range of light work.  She argues that there is no medical opinion supporting the ALJ's finding and therefore, the ALJ improperly substituted his own opinion.  The Commissioner responds that the

13

medical evidence as a whole indicates that Williams was not as limited as some of her treating physicians indicated and there is substantial evidence to support the ALJ's decision.

      a.    <u>Dr. Warren Williams</u>.

Dr. Williams saw the plaintiff for the first time on September 9, 2003.  R. 250.  She returned to his office on October 8, 2003.  Dr. Williams reported that she presented all the signs and symptoms of advanced lumbar degenerative disc disease.  It was his opinion that plaintiff was "permanently and totally disabled from any type of gainful employment."  R. 249.  On May 20, 2004, Williams completed the residual functional capacity form.  R. 185-86.  The record does not indicate why the plaintiff went to Dr. Williams on September 9, 2003 or why she stopped seeing him after her second visit on October 8, 2003.

Although the ALJ considered the opinion of Dr. Williams, he determined not to give it controlling weight.  R. 21.  As to the statement by Dr. Williams that plaintiff was permanently and totally disabled, the ALJ said this was an opinion reserved for the Commissioner.  Pursuant to 20 C.F.R. § 404.1527(e), Dr. Williams' statement on disability was a legal conclusion reserved to the Commissioner and the ALJ was not required to give it any significance.[4]

The ALJ found that Dr. Williams' statement of limitations was not consistent with the objective medical evidence.  Dr. Williams described plaintiff as suffering from advanced lumbar degenerative disc disease.  The July 17, 2003 x-rays of the plaintiff's lumbar spine described her condition as only degenerative changes in the lumbar spine.  R. 133.  A January 19, 2004 MRI of the lumbar spine demonstrated disc bulges and disc protrusions at L5-S1 and S1-2 with only moderate spinal stenosis at L5-S1 and minimal spinal stenosis at S1-2.  R. 241-42.  A consultative

---

[4] The regulations state that, "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."  20 C.F.R. § 404.1527(e)(1).

examination of the plaintiff by Dr. Reddy revealed an absence of muscle atrophy and other objective findings which were inconsistent with Dr. Williams' statement that she suffered from advanced degenerative disc disease.  R. 181-83.  Dr. Williams indicated that the plaintiff suffered from reflex loss, but Dr. Reddy found that her reflexes were normal.  R. 181-83 and 185-86.

The ALJ noted that Dr. Williams only saw the plaintiff on two occasions.  Pursuant to 20 C.F.R. § 404.1527(d)(2), the ALJ was permitted to consider the length of treatment.

Dr. Williams saw the plaintiff in September and October 2003.  The ALJ reported that this was well before the plaintiff underwent physical therapy which improved her symptoms.  The plaintiff went to physical therapy in March and April of 2004.  R. 286-89.  The physical therapy results provided a further basis for the ALJ's decision to not give controlling weight to Dr. Williams' opinion.

     b.    <u>Dr. Raja Talluri</u>.

The medical evidence demonstrates that plaintiff began seeing Dr. Talluri, a specialist in internal medicine, regularly on November 18, 2001.  R. 162.  Dr. Talluri completed two functional capacity evaluations.  The first is dated January 22, 2002, which was consistent with the plaintiff's residual functional capacity as determined by the ALJ.  R. 20 and 226-27.  The second was dated July 21, 2003.  In it Dr. Talluri remarked that plaintiff's complaints of low back pain were based more on subjective symptoms.  R. 230-31.  In <u>Scott v. Heckler</u>, 770 F.2d 482, 485 (5th Cir. 1985), the Fifth Circuit stated:

> This court has repeatedly held that ordinarily the opinions, diagnoses and medical evidence of a treating physician who is familiar with the claimant's injuries, treatment, and responses should be accorded considerable weight in determining disability.  There are exceptions to this principle.  The ALJ may give less weight to a treating physician's opinion when "there is good cause shown to the contrary," as is the case when his statement as to disability is "so brief and conclusory that it lacks

strong persuasive weight," is not supported by medically acceptable clinical laboratory diagnostic techniques, or is otherwise unsupported by the evidence.

Id. at 485.  Dr. Talluri's reliance on subjective symptoms provided the ALJ with good cause to decline to give his opinion controlling weight.

      c.     Dr. Anthony Ioppolo.

On October 20, 2003, Williams was seen by Dr. Ioppolo, a neurosurgeon, on a referral from Dr. Talluri.  R. 246-47.  He saw her again on November 10, 2003, December 16, 2003, and January 12, 2004.  R. 243-45.  He reported that, after using splints, her carpal tunnel syndrome improved. R. 243.  He referred her to physical therapy from which she benefitted.  R. 289.  He obtained an MRI which demonstrated disc bulges and disc protrusions at L5-S1 and S1-2 with only moderate spinal stenosis at L5-S1 and minimal spinal stenosis at S1-2.  R. 241-42.  On February 24, 2004, Dr. Ioppolo completed a two-page functional capacity evaluation which indicated that Williams could not perform light duty work.

In determining not to give Dr. Ioppolo's opinion controlling weight, the ALJ cited: (a) the limited number of visits (four) by Williams; (b) the improvement found as result of physical therapy; (c) the absence of full support for the opinion in the lumbar MRI and x-ray; and (d) the conservative treatment prescribed for Williams.  R. 20-21.  For the reasons described above for Dr. Williams, these factors provided the ALJ with good cause to give less weight to the opinion of Dr. Ioppolo. Scott, 770 F.2d at 485.

      d.     Other medical evidence.

On September 4, 2003, Williams was seen by Dr. N. Reddy, M.D., for a consultative examination.  The report states:

There were no sensory or motor deficits.  Her gait and ROM [range of motion] are

16

> normal.  There were no spasms or neurological defects or atrophy.  Her dexterity,
> grip strength and grasping ability are also normal.  ROM of the back and neck are
> normal.  ROM of all extremities are normal.

R. 182-83.  The medical notes for Williams' emergency room visit on December 14, 2003 revealed

5/5 motor strength in all limbs, the sensory examination was intact and reflexes were 2+ and

symmetrical.  There was no numbness or tingling in the extremities.  R. 261.  Where there is reliable

medical evidence from a treating or examining physician controverting the claimant's treating

specialist, an ALJ may reject the opinion of the treating physician.  Newton v. Apfel, 209 F. 3d 448,

453 (5th Cir. 2000).  There was substantial evidence to support the ALJ's decision to not give

controlling weight to the opinions of Drs. Williams, Talluri and Ioppolo.

Issue no. 2.      Did the ALJ err by not contacting the treating physicians to obtain additional
                  information?

Williams urges that if the ALJ found that the opinions of the treating physicians were

deficient, the regulations, 20 C.F.R. § 404.1512(e), required that he recontact them.  In Newton, the

Fifth Circuit stated:

> [I]f the ALJ determines that the treating physician's records are inconclusive or
> otherwise inadequate to receive controlling weight, absent other medical opinion
> evidence based on personal examination or treatment of the claimant, the ALJ must
> seek clarification or additional evidence from the treating physician in accordance
> with 20 C.F.R. § 404.1512(e).

209 F.3d at 453.  As demonstrated above, the ALJ had before him other medical opinion evidence

which was based on personal examination and treatment of Williams.  Newton does not require that

the ALJ seek further information from the treating physicians.

Williams has not demonstrated what additional information would have been produced by

contacting her treating physicians and how it might have lead to a different decision.  In Newton,

the Fifth Circuit held that, "[r]eversal, however, is appropriate only if the applicant shows prejudice

17

from the ALJ's failure to request additional information." Id. at 458.  The ALJ was not required to contact the treating physicians to obtain additional information.

Issue no. 3.     Did the ALJ err in rejecting the opinions of the treating physicians without addressing the factors in 20 C.F.R. 404.1527(d)(2)?

Williams contends that the ALJ could not reject the opinions of the treating physicians without addressing the facts found in § 404.1527(d).[5]  In Newton, the Fifth Circuit stated:

> The Court concludes that, absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2).

209 F.3d at 453.  The detailed analysis sought by Williams is only required where there is no reliable medical evidence from a treating or examining physician controverting her treating specialists.  The consultative examination by Dr. Reddy and the December 14, 2003 examination in the emergency room visit provide such reliable medical evidence.

## RECOMMENDATION

Accordingly, IT IS RECOMMENDED that defendant's cross-motion for summary judgment (Rec. doc. 16) be GRANTED and plaintiff's motion for summary judgment (Rec. doc. 14) be DENIED.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within ten (10) days after being

---

[5]  This regulation requires consideration of:  (1) the physician's length of treatment of the claimant; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) the support of the physician's opinion afforded by the medical evidence; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the treating physician.  Newton, 209 F.3d at 456.

served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 20th day of May, 2008.

**SALLY SHUSHAN**
**United States Magistrate Judge**

19